## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

——————————————————

**CHARLENE BROKER**,

        Plaintiff,

     v.

**JO ANNE B. BARNHART,**
**Commissioner of Social Security**,

        Defendant.

——————————————————

Civil No. 04-1664 (DWF/JGL)

**REPORT & RECOMMENDATION**

Steven M. Bradt, Esq., on behalf of Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, on behalf of Defendant.

————————————————————————————

JONATHAN LEBEDOFF, Chief United States Magistrate Judge

## I.    INTRODUCTION

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the Commissioner's final decision, which denied her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The matter is presently before the Court on the parties' cross-motions for summary judgment regarding the Commissioner's final decision denying Plaintiff SSI benefits.

For reasons which follow, the Court recommends that the Plaintiff's Motion for Summary Judgment be denied and Defendant's Motion for Summary Judgment be granted.

## II.   PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on September 24, 2001, alleging disability since April 1, 1999, due to lower back problems.  [Tr. 59, 60-62, 81, 277-79.]  Her claim was denied initially, and upon reconsideration.  [Tr. 24-28, 29-33, 35-37, 280-87.]

On October 9, 2002, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  [Tr. 39.]  On June 12, 2003, a hearing was conducted before Administrative Law Judge Mary M. Kunz.  [Tr. 292-314.]  On September 23, 2003, the ALJ issued a decision denying Plaintiff's claims.  [Tr. 11-23.]  On November 11, 2003, Plaintiff requested administrative review before the Appeals Council.  [Tr. 8-10.]  On February 27, 2004, the Appeals Council denied Plaintiff's request for review.  [Tr. 5-7.]  Thus, the ALJ's decision became the final decision of the Commissioner.  Sims v. Apfel, 530 U.S. 103, 106 (2000); Hutsell v. Massanari, 259 F.3d 707, 710 (8th Cir. 2001). Plaintiff sought judicial review of the agency's decision, and an action was commenced on April 16, 2004.

## III.   FACTUAL BACKGROUND

Plaintiff was born on March 1, 1968, and was 35 years old at the time of the ALJ's decision.  [Tr. 22.]  Plaintiff is married and has one child.  [Tr. 60-61, 156.]  Plaintiff is a high school graduate and has attended some college classes.  [Tr. 87, 296.]  Plaintiff has past relevant work experience as a waitress, sales clerk, office clerk, bar tender and cashier.  [Tr. 94-109, 114-33.]  Plaintiff has not performed any substantial gainful activity since her alleged onset date of April 1, 1999.  [Tr. 22, 298.]

On January 12, 1999, Plaintiff was seen at the East Range Clinic by a Dr. Duane Person ("Dr. Person"), for evaluation of her back pain related to a worker's compensation claim.  [Tr. 170.]  Plaintiff reported having pain for over a year, stating that the pain went down into her left leg and that she experienced sharp twinges at night.  [Tr. 169-70.]  Plaintiff reported injuring her back in 1997 while lifting a box.  [Tr. 170, 189.]  Plaintiff reported that she slept with her legs bent at night and that it seemed to help.  [Tr. 170.]  On physical examination, Plaintiff's knee and achilles reflexes were present but diminished.  [Tr. 169.]  Plaintiff was able to walk on her heels and toes without problem.  [Tr. 169.]  Straight leg raise testing was negative for radicular symptoms on the left to 90 degrees, with pain on the right at approximately 80 degrees.  [Tr. 169.]  Plaintiff reported that her pinprick sensation was duller on the posterior part of her left leg.  [Tr. 169.]  Plaintiff's range of

motion in her back was reduced.  [Tr. 169.]  X-rays taken were noted as non-

contributory to the exam.  [Tr. 169.]  Plaintiff was diagnosed with a low back

strain and recommended conservative treatment.  [Tr. 169.]

   On April 1, 1999, Plaintiff was seen at the Duluth Clinic -

Virginia, complaining that she had woken up the previous Sunday with "a lot

of pain going down into her right leg down to about mid thigh posteriorly."

[Tr. 210.]  Dr. Person noted that Plaintiff had been working without any

problem and that she had been doing very well since being seen in January.

[Tr. 210.]  Plaintiff reported that she had been sitting in a "hot, hot bath" and

Dr. Person informed that it was not a good idea to do that.  [Tr. 210.]  Dr.

Person noted that Plaintiff walked with a very guarded movement, more on the

right side than the left.  [Tr. 210.]  On exam, straight leg raise testing was

about 90 degrees on the left and 75 degrees on the right.  [Tr. 210.]  Plaintiff

again wanted to try conservative treatment and was given a prescription for

anti-inflammatories and pain relievers.  [Tr. 211.]  Dr. Person scheduled a

follow-up appointment for a week later.  [Tr. 211.]

   On April 9, 1999, Plaintiff followed-up with Dr. Person and

complained that she was "hurting a lot more."  [Tr. 208.]  Plaintiff reported a

lot of leg numbness and pain going down behind her leg and through the

buttock area.  [Tr. 208.]  Plaintiff asked to have an MRI and one was scheduled

- 4 -

for April 13, 1999.  [Tr. 208.]  The MRI revealed that Plaintiff had a large

central right paramidline disc herniation that produced severe spinal stenosis

with flattening of the thecal sac posteriorly, laterally, and to the left with

impingement of the proximal right L5 nerve root.  [Tr. 163.]  Mild decrease in

the height of the disc at the L5-S1 level was also seen, as well as some bony

spurring peripherally at the L5-S1 level producing some mild to moderate

foramina[1] narrowing without clear evidence of peripheral nerve root

impingement. [Tr. 163.]  Also indicated was mild degenerative changes of the

facet joints at the L4-5 and L5-S1 levels.  [Tr. 163.]

On April 15, 1999 Plaintiff was seen by Dr. Scott C. Dulebohn

("Dr. Dulebohn") on referral from Dr. Person.  [Tr. 155-56.]  Plaintiff related

pain in her low back on the right side, down the outside and back side of her

right leg and calf.  [Tr. 156.]  Plaintiff described the pain as a dull ache, sharp,

sharp, stabbing, shocklike, burning, and shooting.  [Tr. 156.]  Plaintiff rated

her pain at "10 out of 10, to the point where she would like to cut half her

body off."  [Tr. 156.]  Dr. Dulebohn reviewed the MRI noting that it revealed a

herniated nucleus pulposus at the L4-5 level with cephalad extrusion and

---

[1]      "Foramina" is the plural of "foramen," which is "the passage formed by the inferior an superior notches on the pedicles of adjacent vertebrae; it transmits a spinal nerve and vessels." Dorland's Illustrated Medical Dictionary 697 (29th Ed. 2000).

some other mass.  [Tr. 156.]  Dr. Dulebohn observed that Plaintiff was weak in

her ability to extend or flex her right leg, her patellar jerk was diminished on

the right as compared to the left and she exhibited diminished strength of hip

abduction and abduction.  [Tr. 156.]  Dr. Dulebohn opined that Plaintiff would

benefit from surgery, specifically an anterior lumbar interbody fusion, noting

that she had not made progress with conservative treatment measures.  [Tr.

156.]  Dr. Dulebohn noted that Plaintiff's back pain might remain after

surgery, a stabilization operation could be considered and might be necessary

given the amount of bone to be removed.  [Tr. 156.]

On April 19, 1999, Plaintiff underwent surgery at St. Mary's

Medical Center.  [Tr. 152.]  Dr. Dulebohn performed an uncomplicated

laminectomy.[2]  [Tr. 152.]  The surgery revealed "[t]wo very large, the size of

four stacked nickel [sic], fragments of disc found displacing the nerve root."

[Tr. 153.]   Dr. Dulebohn noted that after the surgery, Plaintiff was able to heal

and toe walk.  [Tr. 152.]  Plaintiff was discharged on April 20, 1999, and

scheduled to follow up with Dr. Dulebohn on May 26.  [Tr. 152.]

On May 26, 1999, Plaintiff was seen by Dr. Dulebohn, who noted

that she was able to heel and toe walk well.  [Tr. 246.]  Plaintiff reported that

---

[2]      A laminectomy is the "excision of the posterior arch of a vertebra."  Id. at
960.

her leg was markedly better as was her back pain.  [Tr. 246.]  Dr. Dulebohn

noted that Plaintiff had lost nine pounds and was walking four miles per day.

[Tr. 246.]  Dr. Dulebohn opined that Plaintiff was making good progress, but

gave her an "off work note" because he felt that she would be unable to engage

in gainful employment.  [Tr. 246.]  In July of 1999, Dr. Dulebohn noted that

Plaintiff was "Doing very well."  [Tr. 247.]

On November 11, 1999, Plaintiff returned to Dr. Person,

complaining that her left leg pain was returning.  [Tr. 205.]  Plaintiff reported

that it was not as bad as it was prior to surgery, but that she was concerned

that it was back and getting worse.  [Tr. 205.]  Dr. Person noted a limited

range of motion of her lumbar spine along with positive straight leg raise

testing bilaterally at approximately 40 degrees.  [Tr. 205.]  Dr. Person

scheduled an MRI and noted that Plaintiff would probably be sent back to Dr.

Dulebohn.  [Tr. 205.]

On December 1, 1999, an MRI was taken of Plaintiff's lumbar

spine.  [Tr. 162.]  The MRI showed that the T12-L1, L1-2, L2-3, and L3-4 discs

were all normal in signal height intensity.  [Tr. 162.]  Post-operative changes

were noted at the L4-5 level on the right side, but there was no evidence of

significant recurrent or residual disc herniation noted.  [Tr. 162.]  The MRI

also revealed posterolateral osteophytes at L4-5 bilaterally mildly encroaching

on the neural foramina of the L5 nerve roots.  [Tr. 162.]  On December 2, 1999, Dr. Person reviewed the MRI and noted that Plaintiff did "did not have anything that would be a surgical type problem."  [Tr. 200.]  Dr. Person indicated that Plaintiff would be treated conservatively.  [Tr. 200.]

On January 14, 2000, Plaintiff underwent an MRI of her cervical spine, which revealed no evidence of disc herniation or protrusion.  [Tr. 161.] On January 15, 2000, Plaintiff was seen by Dr. Susan M. Rudberg ("Dr. Rudberg"), on a worker's compensation complaint.  [Tr. 166.]  Dr. Rudberg noted that Plaintiff had an MRI of cervical spine taken the day before under the care of Dr. Dulebohn.  [Tr. 166.]  Plaintiff reported numbness and tingling in her fingers which had increased to her forearm, and at times, her elbow. [Tr. 166.]  Dr. Rudberg noted that Plaintiff lost sensation anteriorly about the C6 nerve root just above the wrist and laterally at the mid forearm. [Tr. 166.] She diagnosed Plaintiff with right arm weakness and increased paresthesias,[3] and advised her to contact Dr. Dulebohn and advise him of her change in symptoms.  [Tr. 166.]

On examination on January 24, 2000, Plaintiff was noted to move about with apparent difficulty.  [Tr. 167.]  Plaintiff was unable to heel and toe

_____

[3]      Paresthesia is defined as an abnormal burning, prickling, tickling or tingling sensation.  Stedman's Medical Dictionary 1316 (27th ed. 2000).

walk but could tandem walk without difficulty.  [Tr. 167.]  Neurological tests

were normal, as were tendon reflexes and strength tests.  [Tr. 167.]  Plaintiff

was diagnosed with fatigue, obesity, right hand pain with swelling,

paresthesia, headaches and chronic back pain.  [Tr. 167.]  On February 29,

2000, Plaintiff complained of pain on straight leg raise on the right side and

when she walked on her toes and heels.  [Tr. 196.]  Plaintiff was informed that

another surgery might be helpful, but she indicated that she was hesitant to

undergo another surgery.  [Tr. 196.]

On March 10, 2000, Dr. Dulebohn wrote that he suspected

Plaintiff's low back pain would wax and wain throughout the course of her

life, but that some of the pain would be alleviated by an ongoing exercise

program and a significant loss of weight.  [Tr. 241.]  Dr. Dulebohn opined that

Plaintiff had a permanent partial disability and that she was severely limited

in the ability to perform any physical labor.  [Tr. 242.]  Dr. Dulebohn noted

that while her surgery had not totally cleared her back pain, it did provide

marked improvement in her radiculopathy.[4]  [Tr. 242.]  Dr. Dulebohn

expressed his hope that Plaintiff would respond well to conservative treatment,

---

[4]      "Radiculopathy" is defined as "a disease of the nerve roots . . . often
manifesting as . . . pain."  Dorland's 1511.

but noted that additional surgery in the form of an anterior lumbar fusion might be necessary.  [Tr. 242.]

Plaintiff followed-up with Dr. Dulebohn on April 5, 2000, complaining of worsening back pain.  [Tr. 240.]  Dr. Dulebohn noted that Plaintiff could heal and toe walk, and that she had no focal weakness.  [Tr. 240.]  Dr. Dulebohn recommended a facet block, and if that did not make a significant difference, a discography in order to determine whether or not Plaintiff's pain was coming from the remaining disk material.  [Tr. 240.]  Dr. Dulebohn also opined that Plaintiff was developing a chronic pain syndrome. [Tr. 240.]

On August 2, 2000, Dr. Dulebohn noted that he had tried every method of conservative treatment that he could think of.  [Tr. 239.]  Dr. Dulebohn opined that it was best to determine whether Plaintiff had spinal instability and whether lumbar fusion should be considered.  [Tr. 239.] Plaintiff was scheduled for a discography.  [Tr. 239.]  Dr. Dulebohn noted that he was pleased that Plaintiff was losing weight.  [Tr. 239.]

A discogram performed on September 6, 2000, revealed that Plaintiff had diffuse spondylosis[5] greatest at L5/S1 along with extensive

_____

[5]     Spondylosis refers to the dissolution of a vertebra, a condition marked by congenital flattening of the vertebral bodies (platyspondylia), lack of development

ligamentum flavum hypertrophy at all levels.  [Tr. 176.]  On December 11,

2000, Dr. Dulebohn opined that an anterior lumbar interbody fusion was the

best approach to Plaintiff's back problem.  [Tr. 235.]  Plaintiff indicated she

was apprehensive about the surgery.  [Tr. 235.]  Dr. Dulebohn noted that

Plaintiff might need further medical care in the event surgery did not solve the

problem.  [Tr. 235.]

On February 13, 2001, Plaintiff underwent surgery at St. Mary's

Medical Center.  [Tr. 171-72.]  Dr. Dulebohn performed a complex

discectomy,[6] anterior arthrodesis, interbody fusion, and a left iliac crest graft

harvest.  [Tr. 172.]  Dr. Dulebohn noted that the surgery revealed that Plaintiff

had markedly degenerated disc space.  [Tr. 172.]  Following surgery, Dr.

Dulebohn noted that Plaintiff was walking and had marked improvement in

her back and leg pain.  [Tr. 171.]  Plaintiff was discharged on February 16,

2001, with medication for pain relief.  [Tr. 171.]

X-rays taken on March 19, 2001, showed fusion at L5-S1 with two

devices in place.  [Tr. 250.]  The x-rays also showed a transitional vertebra at

_____

(aplasia) of the vertebral arch, and separation of the part of the lamina between
the superior and inferior articular processes of a lumbar vertebra (pars
interarticularis).  Id. 113, 1329, 1401, 1684.

[6]      A diskectomy is the "excision of an intervertebral disk[.]"  Id. 526.

the first sacral segment, and that the remainder of the vertebral bodies and disc spaces were maintained.  [Tr. 250.]

On May 2, 2001, Dr. Dulebohn saw Plaintiff on follow up.  [Tr. 227.]  Plaintiff reported that her leg and back pain were better than they were preoperatively.  [Tr. 227.]  Dr. Dulebohn noted that Plaintiff weighed 209 pounds, down from 245 pounds when he first started working with her, and he opined that losing another 30-40 pounds would "make a huge difference." [Tr. 227.]  Dr. Dulebohn recommended that Plaintiff participate in physical therapy.  [Tr. 227.]

On June 26, 2001, Plaintiff was referred by Dr. Dulebohn to Dr. T. Mark Seidelmann ("Dr. Seidelmann"), in the Department of Physical Medicine and Rehabilitation at the Duluth Clinic.  [Tr. 223-25.]  Dr. Seidelmann noted minimal spinal tenderness and some tenderness of the lumbar paraspinal musculature.  [Tr. 224.]  Dr. Seidelmann observed that Plaintiff was able to heel and toe walk, but with an imbalance.  [Tr. 224.]  Plaintiff's light touch and pin prick sensation was decreased through her right foot with the greatest decrease in the L4 dermatomal distribution.  [Tr. 224.]  Dr. Seidelmann did not attempt a spinal range of motion due to Plaintiff's recent fusion.  [Tr. 224.] Dr. Seidelmann referred Plaintiff to physical therapy.  [Tr. 224.]

On August 1, 2001, Dr. Dulebohn dictated a note to Dr. Seidelmann, in which he noted that he was "really pleased with [Plaintiff's] progress." [Tr. 222.] Dr. Dulebohn stated that he hoped to work Plaintiff off of her pain medication. [Tr. 222.] Dr. Dulebohn stated that Plaintiff should continue to work on neutral spine strengthening. [Tr. 222.]

On September 7, 2001, Plaintiff again saw Dr. Seidelmann, who noted that she had "done very well in the interim." [Tr. 221.] Dr. Seidelmann noted improved flexibility and mobility through the spine and pelvis and lower extremities. [Tr. 221.] Plaintiff reported that she was pleased with her progress and that she was losing weight. [Tr. 221.[ Dr. Seidelmann planned to see Plaintiff on December 11, in order to hopefully advance her program. [Tr. 221.]

On December 4, 2001, Dr. Cliff Phibbs ("Dr. Phibbs"), a state agency physician, reviewed the medical record. [Tr. 252-59.] Dr. Phibbs opined that Plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hours workday, sit about 6 hours in an 8-hours workday, and was limited in her ability to push and/or pull with her lower extremities. [Tr. 253.] Dr. Phibbs also opined that Plaintiff could occasionally climb ramps and stairs, but never ladders, ropes or scaffolds. [Tr. 254.] Plaintiff could occasionally

- 13 -

stoop, crouch, and crawl, and frequently balance and kneel.  [Tr. 254.] On May

21, 2002, Dr. Atar Suddard, also a state agency physician, reviewed the

medical record and concurred with the opinion of Dr. Phibbs.  [Tr. 259.]  On

January 9, 2002, Dr. S. Latchamsetty, another state agency physician,

reviewed the medical record and concurred with the opinion of Dr. Phibbs.

[Tr. 183-84.]

On December 5, 2001, Plaintiff saw Dr. Dulebohn, complaining of

continued pain in her right SI joint.[7]  [Tr. 220.]  Dr. Dulebohn opined that

Plaintiff would benefit from an SI block.  [Tr. 220.]  On December 11, 2001,

Plaintiff saw Dr. Seidelmann, who noted that she continued to have significant

low back and sacral region pain.  [Tr. 218.]  On examination, Dr. Seidelmann

noted that Plaintiff demonstrated significant tenderness in her right SI joint

as compared to the left.  [Tr. 218.]  Dr. Seidelmann also noted significant pain

in Plaintiff's L5-S1 region when provoked with extension.  [Tr. 218.]  Dr.

Seidelmann noted that Plaintiff continued to be off work.  [Tr. 218.]

On February 4, 2002, Plaintiff was seen by Dr. Molly Urban ("Dr.

Urban") for evaluation of her SI joint and possible injection.  [Tr. 189.]  Plaintiff

described a dull throbbing pain in the middle of back with pain into her hip

---

[7]     The "SI joint" refers to the joint between the sacrum and the illium, and is also referred to as the "sacroiliac joint."  Id. 1593.

- 14 -

area on the right with numbness down her right lower extremity.  [Tr. 189.]

Plaintiff described the pain as being as high as 10 on a scale of 10, but on

average about 5-6.  [Tr. 189.]  Plaintiff indicated that standing in one place

aggravated her pain.  [Tr. 189.]  Dr. Urban gave Plaintiff a right SI joint

injection and an L5-S1 right sided facet joint injection, noting that Plaintiff

tolerated the procedure well.  [Tr. 189.]

On February 20, 2002, Dr. Seidelmann spoke with Plaintiff over

the phone. [Tr. 215.]  Plaintiff reported that the injections had helped her

pain, but that she felt her pain was coming back.  [Tr. 215.]  Dr. Seidelmann

referred Plaintiff for another injection.  [Tr. 215.]  On March 6, 2002, Dr.

Urban gave Plaintiff another injection of the L5-S1 facet joint.  [Tr. 188.]  On

April 10, 2002, Dr. Seidelmann again spoke with Plaintiff over the phone.  [Tr.

214.]  Plaintiff stated that she had a progressive return of pain extending to

the back of her knee.  [Tr. 214.]  Plaintiff indicated that the pain was constant.

[Tr. 214.]  Dr. Seidelmann noted that Plaintiff would follow up with Dr. Urban

for an additional injection.  [Tr. 214.]

On May 8, 2002, Plaintiff reported to Dr. Urban that she had

received most relief from the epidural injection as opposed to the SI injection,

but that the relief did not seem to last very long.  [Tr. 273.]  Plaintiff reported

continued numbness in her leg, mostly in her posterior right thigh.  [Tr. 273.]

Plaintiff reported continuing physical therapy.  [Tr. 273.]  Dr. Urban gave

Plaintiff another injection at L5-S1, noting that Plaintiff tolerated the

procedure well.  [Tr. 273.]

On June 28, 2002, Plaintiff returned to Dr. Seidelmann, reporting

that she had not received any significant benefit from her latest injection.  [Tr.

263.]  Plaintiff reported ongoing severe low back pain and that she was only

able to sleep two to three hours per night.  [Tr. 263.]  Dr. Seidelmann

assessed Plaintiff with degenerative disc disease with herniated disc at the L4-

5 level status post laminectomy and spinal fusion.  [Tr. 263.]  He noted that

she had undergone multiple injections but had received no sustained benefit.

[Tr. 263.]  Dr. Seidelmann noted that the ongoing etiology of Plaintiff's pain

was not clear and that she might have some micro-instability or

pseudoarthrosis,[8] but that analysis would be held off because there was no

change in strength or sensation.  [Tr. 263.]  Dr. Seidelmann recommended

trying other medications and suggested that an injection of Botulinum Toxin

into Plaintiff's lumbar paraspinal muscles might be beneficial  [Tr. 264.]

Plaintiff returned to Dr. Seidelmann on January 2, 2003,

reporting continued significant low back pain.  [Tr. 261.]  Plaintiff stated that

---

[8]    "A new, false joint arising at the site of an ununited fracture."  Stedman's
1469.

she was having difficulty sleeping and finding comfortable positions.  [Tr. 261.]

Plaintiff indicated that the pain was worse in the mid-low lumbar spine level

and made worse with extension and rotation, especially to the right.  [Tr. 261.]

On examination, Dr. Seidelmann noted significant tenderness through the

low lumbar segments particularly at the L4-5 level on the right and lesser to

the left.  [Tr. 261.]  Dr. Seidelmann also observed significant muscle tightness

throughout the region and noted that motion was severely limited in all

planes.  [Tr. 261.]  Dr. Seidelmann "[d]iscussed potential etiology of constant

irritation of the nerve fibers causing muscle spasm in a cycle that is difficult to

break versus muscle guarding secondary to instability."  [Tr. 262.]  Dr.

Seidelmann again discussed the potential benefits of Botulinum Toxin

injection to reduce muscle spasms.  [Tr. 262.]  Dr. Seidelmann instructed

Plaintiff to continue her pain medication and prescribed a muscle relaxer.  [Tr.

262.]

## IV.    HEARING TESTIMONY

Plaintiff appeared at the hearing held June 12, 2003.  [Tr. 292.]

Plaintiff was accompanied by her attorney, Steven Bradt.  [Tr. 292.]  Dr.

Andrew Steiner appeared and testified as a Medical Expert ("ME") at the

hearing.[9]  [Tr. 317.]  Mitchell Norman appeared and testified as a Vocational

Expert ("VE") at the hearing.  [Tr. 320.]

A.      **Plaintiff's Testimony**

Plaintiff testified that she last worked around April 1, 1999.  [Tr.

298.]  Plaintiff stated that she stopped working due to her back pain and that

she could not sit, stand or walk for very long.  [Tr. 298.]  Plaintiff testified that

she does "a lot of laying with my legs propped."  [Tr. 298.]  Plaintiff stated that

the her back pain was constant, but that the intensity varied.  [Tr. 298.]

Sometimes the pain was just throbbing and dull, but at other times more

severe, especially during her endometriosis.  [Tr. 298.]  Plaintiff testified that

the weather getting cooler could also make her pain increase.  [Tr. 298-99.]

Plaintiff testified that she experienced pain in her right leg, and that the pain

was sharp.  [Tr. 310.]

Plaintiff testified that sitting on the toilet would make her leg

start to go numb, and that she needs help getting off of the toilet.  [Tr. 299.]

Plaintiff testified that she has help showering.  [Tr. 299.]  Plaintiff stated that

she could sit for no longer than 15 minutes before her leg would go numb.

_____

[9]      The transcript submitted with the bound administrative record cuts
off at page 314, before the testimony of Dr. Steiner and Mitchell Norman.
Defendant filed the rest of the proceedings as a supplemental transcript.  [Docket
No. 12.]

[Tr. 299.]  Plaintiff stated that if she was home alone it was often a struggle to

get out of a chair by herself.  [Tr. 299.]  Plaintiff testified that walking would

exacerbate her leg pain and send pain up her leg and into her back.  [Tr. 299.]

Plaintiff stated that she could walk for about 15 minutes before  experiencing

problems.  [Tr. 299-300.]  Plaintiff testified to similar restrictions on her ability

to stand.  [Tr. 300.]  Plaintiff stated that it was hard to go up and down the

stairs in her apartment building.  [Tr. 311.]

Plaintiff testified that lifting was hard for her and that she never

carried much more than a plate of food or a bowl of cereal.  [Tr. 300.]  Plaintiff

stated that she had difficulty lifting her arms above her head without causing

pain in her back.  [Tr. 300.]  Plaintiff testified that her husband helped her to

shower and to groom her hair, while she sat on a char.  [Tr. 300-01.]  Plaintiff

testified that she could brush her teeth without help, but that reaching for

things up high or down low would trigger the pain in her back.  [Tr. 301.]

Plaintiff testified that she could button and use zippers, but that she needed

help putting on her pants and socks.  [Tr. 302.]

Plaintiff also testified that she suffered from endometriosis with

the cramping so severe that for two weeks out of the month she would not get

out of bed, except to get something to drink or to vacuum. [Tr. 303.]  Plaintiff

stated that the endometriosis caused swelling and pressure on her back.  [Tr.

303.]  Plaintiff testified that at times she would be angry and yelling at people or crying because of her pain.  [Tr. 303.]  Plaintiff testified that she was not seeing a psychiatrist.  [Tr. 304.]

Plaintiff testified that during a typical day she would wake up at 8:00 a.m., eat and take her medication and then go to the couch to watch TV and "sleep a little."  [Tr. 304.]  Plaintiff stated that her husband would sometimes bring her medication and food to her.  [Tr. 304-05.]  Plaintiff estimated that she spent a half to 3/4 of a typical day laying down.  [Tr. 312.]  Plaintiff testified that she would continue to watch TV or read magazines, but that she could no longer read books or play cards with her husband because she did not have the concentration or attention.  [Tr. 305, 307.]  Plaintiff testified that she would shower every three or four days because it was so much work.  [Tr. 305.]  Plaintiff testified that her husband did the household chores including cooking and cleaning, but that she could make herself a bowl of cereal of cook things in a crockpot.  [Tr. 305-06.]  Plaintiff testified that she would leave the house for doctors' appointments or for therapeutic appointments, and that "once in a great while" her husband and her would go to his parents house for a meal.  [Tr. 307.]  Plaintiff stated that she did not drive.  [Tr. 311.]

Plaintiff testified that elevating her legs with icing, massaging and using a heating pad relieved some discomfort.  [Tr. 309.]  Plaintiff testified that afternoons were best for her, because her medications worked to dull the pain.  [Tr. 309-10.]  Plaintiff testified that the most comfortable position to relieve her pain was to lay on her side with her legs propped up and a pillow between her legs, which worked to take the full pressure off of her back.  [Tr. 310.]  Plaintiff testified that sitting at the hearing and testifying was causing her pain.  [Tr. 310.]  Plaintiff stated that there had never been a time since her first back surgery that she did not experience pain.  [Tr. 309.]  Plaintiff testified that she was taking Hydrocodone and Oxycontin for her pain.  [Tr. 312.]  When asked about side effects, Plaintiff stated that the medication made her sleepy, that her mouth was dry and that they caused constipation.  [Tr. 312.]

### B.  **The Medical Expert's Testimony**

The ME testified that it was his opinion that Plaintiff's back pain was "probably more the result of the chronic pain syndrome than any instability situation."  [Tr. 318.]  The ME testified that Plaintiff's testimony was consistent with a diagnosis of endometriosis.  [Tr. 320.]  The ME testified that absent any documentation of ongoing significant neurological loss, that Plaintiff's impairment was not of listing level severity.  [Tr. 319.]  The ME

testified that the record supported functional limitations at a sedentary level, with the ability change position every half hour.  [Tr. 319-20.]  The ME testified that Plaintiff would also be subject to certain postural limitations, including only occasionally bending, twisting, stooping, kneeling, crawling, crouching and climbing.  [Tr. 320.]

C.    **The Vocational Expert's Testimony**

At the hearing, the ALJ posited the following hypothetical to the VE:

> [W]e have an individual is presently 35.  * * *  And this individual has a high school education and work experience described [inaudible].  She is impaired by a history of degenerative disk disease in the lumbar spine with past surgical procedures including a laminectomy, diskectomy, and fusion.  She's been diagnosed with obesity, [inaudible] secondary to endometriosis, adjustment disorder, and depression, and chronic pain syndrome, and bursitis.  If such that –in the first hypothetical question I want you to assume that she would be limited to sedentary work which I'm defining as lifting up to 10 pounds occasionally, up to six hours of sitting and two hours of walking and standing in an eight hour workday.  This work would be further limited by the need to alternate between position hourly.  It should not involve more than occasional bending, twisting, stooping, kneeling, crouching, crawling, or climbing.  And because of the presence of pain and side effects from her medications I would also limit her to unskilled work.

[Tr. 321-22.]  When asked if such an individual would be able to perform any of Plaintiff's past relevant jobs, the VE testified "No."  [Tr. 322.]

The ALJ then asked if such an individual could perform other jobs in the national economy.  [Tr. 322.]  The VE testified in response that such an individual could perform the jobs of telephone quotation clerk, order clerk or surveillance systems monitor.  [Tr. 322-23.]  The VE testified that there were approximately 2,900 jobs in the regional economy as a telephone quotation clerk, 6,500 jobs as an order clerk, and 2,400 jobs as a surveillance systems monitor.  [Tr. 322-23.]

In response to the ALJ's question about the acceptable rate of absenteeism, the VE testified that an individual could miss work no more than two or three times a month.  [Tr. 323.]  When asked if an individual could not attend work for up to two weeks each month, the VE testified that such an individual could not be gainfully employed.  [Tr. 323.]  In response to Plaintiff's attorney, the VE testified that an individual who needed to lie down at irregular intervals and for irregular periods would probably not be employable.  [Tr.  323.]

**D.    Post-Hearing Evidence**

Subsequent to the hearing, Plaintiff submitted a letter written to Plaintiff's attorney by Dr. Seidelmann on June 9, 2003.  [Tr. 276.]  In the letter, Dr. Seidelmann noted that he had not released Plaintiff to work in any capacity since her initial surgery in April of 1999.  [Tr. 276.]  Dr. Seidelmann

also stated that he did not believe that Plaintiff was capable of working on a regular basis in any capacity including sedentary work.  [Tr. 276.]  Dr. Seidelmann referred to his dictation to substantiate his opinion that Plaintiff was unable to work.  [Tr. 276.]

**V.    THE ADMINISTRATIVE LAW JUDGE'S DECISION**

The ALJ issued the relevant decision on September 23, 2003.  [Tr. 23.]  The ALJ applied the five-step analytical process as prescribed in 20 C.F.R. §§ 404.1520 and 416.920.  [Tr. 15.]  At the first step, the ALJ considered whether Plaintiff had engaged in substantial gainful activity.  [Tr. 15.]  At the first step, the ALJ considered whether Plaintiff had engaged in substantial gainful activity.  [Tr. 15.]  The ALJ found that Plaintiff had not engaged in any substantial gainful activity since her alleged onset date.  [Tr. 15.]

At step two, the ALJ considered whether Plaintiff is subject to a severe physical or mental impairment.  [Tr. 15.]  The ALJ found that Plaintiff was subject to degenerative disc disease of the lumbar spine status post laminectomy/discectomy and a fusion at L4-5, a severe impairment.  [Tr. 16.]  The ALJ also found that Plaintiff was subject to the following additional severe impairments: obesity, endometriosis resulting in dysmenorrhea, and bilateral trochanteric bursitis.  [Tr. 17.]  Based on the testimony of the ME, the ALJ

- 24 -

concluded at the third step that Plaintiff's physical impairments did not meet or equal the relevant criteria of any listed impairments.  [Tr. 16.]  The ALJ found that Plaintiff was not subject to a mental impairment.  [Tr. 18.]

The ALJ thus turned to step four, which involves a determination of Plaintiff's RFC.  20 C.F.R. §§ 404.1520(e) and 416.920(e); [Tr. 18.]  The ALJ determined Plaintiff's RFC by evaluating the medical records and by assessing Plaintiff's subjective complaints of disability.  20 C.F.R. §§ 404.1529(c) and 416.929(c); Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984);  [Tr. 18-21.]  The ALJ found that Plaintiff retained

> the residual functional capacity for unskilled sedentary
> work involving lifting and carrying 10 pounds occasionally,
> sitting for six hours and standing and/or walking two hours
> in an eight-hour day, that allows for change of position
> every hour, and requires no more than occasional bending,
> twisting, stooping, crouching, crawling, or climbing.

[Tr. 18.]  Based on the testimony of the VE, the ALJ determined that Plaintiff was unable to perform her any of her past relevant work.  20 C.F.R. §§ 404.1520(f) and 416.920(f); [Tr. 21.]

The ALJ thus turned to step five, and determined whether Plaintiff could perform any other work existing in the national economy.  20 C.F.R. §§ 404.1520(g) and 416.920(g); [Tr. 21.]  Based on the testimony of the VE, the ALJ concluded that Plaintiff was capable of performing the jobs of telephone quotation clerk, order clerk and surveillance system monitor.  [Tr. 24.]  The

ALJ thus concluded that Plaintiff did not meet the statutory criteria for a finding of disability.  [Tr. 25.]

## VI.   DISCUSSION

### A.    <u>Standard of Review</u>

Judicial review of Defendant's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole.  42 U.S.C. §405(g); <u>Morse v. Shalala</u>, 32 F.3d 1228, 1229 (8th Cir. 1994).  Substantial evidence is enough evidence that a reasonable person might accept as adequate to support a conclusion. <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001).  Where such evidence exists, a court is required to affirm defendant's factual findings. <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001).  On the other hand, the analysis must include evidence in the record which detracts from the weight of the evidence supporting the ALJ's decision. <u>Burress v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998).  Thus, the court must consider the weight of the evidence in the record and apply a balancing test to evidence which is contrary.  <u>Id.</u>

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular

finding from being supported by substantial evidence.  <u>Culbertson v. Shalala</u>,

30 F.3d 934, 939 (8th Cir. 1994).

B.   **<u>The ALJ's Evaluation of the Medical Evidence</u>**

Plaintiff contends that the ALJ improperly evaluated the medical

evidence and failed to consider all of the relevant evidence with respect to her

physical impairment.[10]  Plaintiff argues that the ALJ improperly rejected the

opinion of Dr. Seidelmann, Plaintiff's treating physician since her second

surgery in February 2001.  Plaintiff contends that the ALJ improperly credited

the testimony of the ME, Dr. Steiner, arguing that the ME's opinion was

contrary to the medical evidence and Plaintiff's credible testimony.

The opinion of a treating physician must be afforded substantial

weight.  <u>Burress v. Apfel</u>, 141 F.3d 875, 880 (8th Cir. 1998).  Nevertheless, an

opinion rendered by a claimant's treating physician is not necessarily

conclusive.  <u>Bentley v. Shalala</u>, 52 F.3d 784, 785-86 (8th Cir. 1995).  An ALJ

may discount a treating physician's medical opinion when the treating

source's statements are conclusory or unsupported by medically acceptable

clinical or diagnostic data.  <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir.

1997); <u>Pena v. Chater</u>, 76 F.3d 906, 908 (8th Cir. 1996); <u>Ghant v. Bowen</u>, 930

---

[10]     Plaintiff does not challenge the ALJ's determination that she is not
subject to a mental impairment.

- 27 -

F.2d 633, 639 (8th Cir. 1991); Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir.

1991); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

When weighing a medical opinion, the ALJ should consider: 1) the

examining relationship; 2) the treatment relationship; 3) whether medical

findings support the opinion; 4) whether the opinion is consistent with the

record as a whole; and 5) whether the physician is a specialist.  20 C.F.R. §

404.1527(d)(1)-(5); Brueggemann v. Barnhart, 348 F.3d 689, 694 (8th Cir.

2003).  It is not, however, the law in the Eighth Circuit that the ALJ must

consider each factor in deciding how much weight to accord a medical opinion,

but rather the ALJ "should 'give good reasons' for discounting a treating

physician's opinion."  Dolph v. Barnhart, 308 F.3d 876, 878-79 (8th Cir. 2003)

(quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000), reh'g and reh'g

en banc denied, April 26, 2000); cf. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir.

2000) (holding that ALJ was not required to methodically discuss each Polaski

consideration, so long as he acknowledged and examined those

considerations).

Plaintiff apparently concedes that she does not meet the

requirements for a disability at Step Three of the sequential evaluation and

instead focuses argument on her RFC allows her to engage in competitive

employment.  Plaintiff contends that Plaintiff's multiple and sever physical

- 28 -

employments result in limitations which prevent her from engaging in competitive employment, and argues that the ALJ's determination of her RFC was flawed by the rejection of Dr. Seidelmann's opinion and the acceptance of the ME's testimony.  Thus, the core issue in this matter is whether the ALJ's rejection of Dr. Seidelmann's opinion is supported by substantial evidence on the record as a whole.

In deciding Plaintiff's RFC, the ALJ considered the findings and opinions of the state agency physicians Dr. Suddard and Dr. Phibbs, who opined that Plaintiff was capable of work at the light exertional level.  [Tr. 18.] The ALJ, however, did not give great weight to their opinions because they were not able to consider all of the medical evidence available.  [Tr. 18.]  The ALJ granted the greatest weight to the testimony of Dr. Steiner, the ME.  [Tr. 18.]  The ALJ noted that the ME was a physical medicine and rehabilitation specialist, and that he was able to review all of the medical evidence submitted by the Plaintiff.  [Tr. 18, 52.]  The ALJ found that the ME's opinion was based on objective medical evidence in the record and was consistent with the results of an independent medical evaluation performed by Dr. Dulebohn.  [Tr. 19.]

The ALJ stated that she carefully considered the opinion of Dr. Seidelmann, who opined that Plaintiff was unable to work in any capacity.  [Tr.

19, 276.]  The ALJ found that although Dr. Seidelmann had been Plaintiff's

treating physician for a significant period of time,[11] his opinion was not

supported by the medical evidence.  [Tr. 19.]  The ALJ acknowledged that Dr.

Seidelmann opined that Plaintiff was incapable of working in any capacity,

and noted that he referred the reader of his letter to the medical record to

support his opinion.  [Tr. 19, 276.]  The ALJ analyzed Dr. Seidelmann's

treatment notes in the medical record, finding that:

> Dr. Seidelmann's clinic records document restricted lumbar
> flexion and extension due to pain.  The claimant reports
> tenderness to palpation over the lumbar area and moves
> around frequently during office visits because of discomfort
> in the low back.  The claimant has followed medical advice
> and has lost some weight and has tried various medications
> and injections for pain.  However, according to Dr.
> Seidelmann, the basis for these complaints is unknown.  In
> June 2002, he noted possible causes for pain, but was
> unable to determine the etiology since diagnostic x-rays
> show that the fusion is solid and there is little loss of
> sensation and no loss of strength in the lower extremities.

[Tr. 19.]  The ALJ concluded, stating that she had, "considered this evidence

but is unable to determine how Dr. Seidelmann arrived at his conclusion that

---

[11]        The ALJ noted that in his letter dated June 9, 2003, Dr. Seidelmann
asserted that he had not released Plaintiff to any work since her surgery in April
1999.  [Tr. 19, 276.]  The ALJ also noted that Dr. Seidelmann had not started
treating Plaintiff until 2001, when Plaintiff was referred to him by Dr. Dulebohn.
[Tr. 19, 225.]  While such a discrepancy might cast doubt on the credibility of Dr.
Seidelmann, the ALJ did not make such a finding, and instead noted that he
"clearly has been the physician managing the claimant's rehabilitation for a
significant period of time."  [Tr. 19.]

the claimant is incapable of working on a regular basis in any capacity, other

than he is expressing his opinion based on the claimant's subjective

complaints of pain." [Tr. 19.] The ALJ noted that a physician's opinion based

solely on a patient's complaints of pain is generally entitled to little weight.

[Tr. 19] (citing Woolf, 3 F.3d at 1214).

The Court notes that Plaintiff does not point to any evidence in

the record to support her contention that the ALJ improperly rejected the

opinion of Dr. Seidelmann.  Rather, Plaintiff relies on the single conclusory

declaration that the ALJ's treatment of Dr. Seidelmann's opinion "is contrary

to all of the medical evidence and the Plaintiff's credible testimony." Mem. in

Support of Mot. for Summ. J., p. 7; [Docket No. 15.]  Plaintiff's apparent

argument is that a treating physician's opinion should always be adopted.

Such is not the law, however, and the ALJ may discount a treating physician's

medical opinion when the treating source's statements are conclusory or

unsupported by medically acceptable clinical or diagnostic data.  See Rogers,

118 F.3d at 602.

In this case, the ALJ considered the factors laid out at 20 C.F.R. §

404.1527(d)(1)-(5), finding that Dr. Seidelmann's opinion was conclusory,

unsupported by medically acceptable evidence, and inconsistent with the

opinions of the ME and Dr. Dulebohn.  [Tr. 19-20.]  The ALJ specifically found

- 31 -

that Dr. Seidelmann appeared to have accepted Plaintiff's subjective

complaints and expressed his opinion based on a sympathetic reflection of

such complaints. [Tr. 19-20.]  A review of the record supports the ALJ's

conclusions.

        The most up to date x-rays in the record indicated that Plaintiff's

second surgery was successful, with fusion at L5-S1.  [Tr. 250.]  It is

uncontroverted that Dr. Seidelmann was unsure of the ongoing etiology of

Plaintiff's complaints of pain, and that question remains unresolved based on

the record before the Court.  [Tr. 262, 264.]  Plaintiff objectively improved

following her stabilization surgery before claiming progressive return of her

pain symptoms.  [Tr. 171, 221-22, 224, 227.]  Dr. Steiner noted that other

than decreased touch and pinprick sensation noted on June 26, 2001, there

were no findings of neurologic deficits.  [Tr. 224, 319.]  Dr. Steiner opined that

Plaintiff should be limited to a restricted range of sedentary work, a

recommendation in accord with Dr. Dulebohn's indication that Plaintiff would

be able to do sedentary work eventually.  [Tr. 242.]  The Court also finds it

significant that Dr. Seidelmann failed to provide any supporting rationale for

his opinion that Plaintiff was unable to work in his letter addressed to

Plaintiff's attorney on June 9, 2003.  [Tr. 276.]  Rather than state his

reasoning and medical findings, he referred the reader back to his dictation to

substantiate his opinion.  [Tr. 276.]  As such, Dr. Seidelmann's ultimate

opinion was conclusory.  <u>See</u> 20 C.F.R. § 404.1527(d)(3).

It is the ALJ's task to weigh and evaluate competing evidence in a

case such as this and the Court may not substitute its own judgment or

findings of fact.  <u>Woolf v. Shalala</u>, 3 F.3d at 1213.  The Court finds that the

ALJ adequately and thoroughly explained her rationale for rejecting the

opinion of Dr. Seidelmann that Plaintiff was precluded from working in any

capacity.  <u>See</u> <u>Dolph v</u>, 308 F.3d at 878-79.  The ALJ also adequately justified

her reliance on the expert testimony of Dr. Steiner, explaining that it was

supported by and consistent with the record as a whole.  It is thus the Court's

conclusion that the ALJ's evaluation of the medical evidence is supported by

substantial evidence on the record as a whole.

### C.   <u>The ALJ's Hypothetical to the Vocational Expert</u>

"Testimony from a VE based on a properly phrased hypothetical

question constitutes substantial evidence."  <u>Roe v. Chater</u>, 92 F.3d 672, 675

(8th Cir. 1996).  While a hypothetical must accurately set forth all of the

claimant's impairments, the question need only include those limitations

accepted by the ALJ as true.  <u>Rappaport v. Sullivan</u>, 942 F.2d 1320, 1323 (8th

Cir. 1991).

Plaintiff argues that the ALJ failed to include all of Plaintiff's disabling limitations in her hypothetical to the VE.  Specifically, Plaintiff asserts that the ALJ failed to include Plaintiff's projected absenteeism and need to lie down throughout the day.  The Court notes that the ALJ did ask the VE whether an individual who needed to be absent for up to two weeks out of the month would be employable, to which the VE responded in the negative.  [Tr. 323.]  The Court also notes that Plaintiff's attorney asked the VE about Plaintiff's alleged need to lie down frequently, and whether that would render the hypothetical individual unemployable.  [Tr. 323.]  The VE responded that it would.  [Tr. 323.]  It is clear that both limitations sought by Plaintiff were elicited at the hearing.

The ALJ, however, rejected the such limitations in formulating Plaintiff's RFC and only incorporated the limitations she found were supported by the record.  [Tr. 20.]  As discussed above, the ALJ's evaluation of the medical evidence in the record is supported by substantial evidence on the record as a whole, and the Court can find no error with the limitations included in the hypothetical propounded to the VE.

Plaintiff also argues that the jobs identified by the VE do not in fact exist in significant numbers in the national or regional economy.  Plaintiff bases her argument on a calculation of the number of jobs available identified by the

VE compared to the number of non-farm jobs available in Minnesota from 1998 to 2003, which she asserts is 2.5 million.  Mem., p. 10.  Based on her calculations, the 2,900 telephone quotation clerk position represent .12% of the jobs available in the state; the 6,500 order clerk positions represent .26% of the available jobs in the state; and the 2,400 surveillance system monitor jobs represent .10% of the jobs available in the state.  Id.  Plaintiff asserts that common sense dictates that the testimony of the VE "establishes nothing more than the theoretical existence of a minimal number of isolated jobs."  Id.

Plaintiff does not cite to any legal authority to support her position, and the Court finds no support for her argument.  To the contrary, there is case law holding that "when there is testimony that a significant number of jobs exists for which a claimant is qualified, it is immaterial that this number is a small percentage of the total number of jobs in a given area . . . ."  Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988); see also Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993) (collecting cases with similar holdings).  The Eighth Circuit Court of Appeals has held that 500 jobs are a significant number, see Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988), and that 200 jobs are a significant number, see Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997).  The Court thus rejects Plaintiff's contention, and concludes

that the ALJ propounded a proper hypothetical to the ALJ, which was

properly analyzed by the VE. See Roe, 92 F.3d at 675.


Based upon all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED**:

1.    Plaintiff's Motion for Summary Judgment should be **DENIED**
      [Docket No. 13];

2.    Defendant's Motion for Summary Judgment should be **GRANTED**
      [Docket No. 21].


Dated: August 5, 2005

                                   s/ Jonathan Lebedoff
                                  JONATHAN LEBEDOFF
                                  Chief United States Magistrate Judge

Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing and serving specific, written objections by August
22, 2005 . A party may respond to the objections within ten days after service
thereof. Any objections or responses filed under this rule shall not exceed
3,500 words. A District Judge shall make a de novo determination of those
portions to which objection is made. Failure to comply with this procedure
shall operate as a forfeiture of the objecting party's right to seek review in the
United States Court of Appeals for the Eighth Circuit.